### Application of AIR MIAMI, Inc.
Docket No. 760166-ACC.     Order No. 13119.
Florida Public Service Commission.

November 5, 1976.

James B. Curasi, Miami, for the applicant.

Robert J. Paterno, Miami, for the protestant AAT Airlines, Inc.

Cynthia S. Joachim of the P.S.C. appearing on behalf of the staff and the public generally; William B. Thomas and Barrett Johnson, both of the P.S.C., appearing for the commissioners.

The following commissioners participated in the disposition of this matter — WILLIAM T. MAYO, Chairman, and Commissioners WILLIAM H. BEVIS and PAULA F. HAWKINS.

BY THE COMMISSION.

Pursuant to notice the commission held public hearings on this application in Key West on June 1 and 18 and July 7, 8, 9 and 10, 1976.

This application was filed pursuant to the provisions of Chapter 330, Florida Statutes, which vests in this commission regulatory jurisdiction over air carriers operating between points within this state. The applicant, Air Miami, Inc., proposes to provide service between Miami and Key West, as well as between Miami and Marathon. The application does not encompass service between Key West and Marathon. The proposed routes are presently served by AAT Airlines, Inc., d/b/a Air Sunshine, which appeared as a protestant.

Section 330.49(6), Florida Statutes, directs the commission, in determining whether to grant a certificate, to take into consideration, among other things, the following —

(a) The business experience of the applicant air carrier in the field of air operations.

(b) The financial stability of the air carrier.

(c) The insurance coverage of the air carrier.

(d) The type of aircraft which the air carrier would employ.

(e) Proposed routes and minimum schedules to be established.

(f) Whether the air carrier could economically give adequate service to the communities involved.

(g) The need for such service and its effect on any regional or statewide transportation plan.

(h) The experience of commission — and Civil Aeronautics Board — certificated air carriers operating over the same or parallel routes.

(i) Any other factors which may affect the public convenience and necessity.

The applicant corporation presently operates a charter airline service, with facilities at Miami International Airport. It flies Cessna 400 series aircraft as an Air Taxi/Commercial Operator, with authority to provide charter services in the United States, the Bahama Islands, Central and South America. The president of Air Miami formerly served as president of AAT Airlines, Inc. for a period of 18 months. He is also an airline pilot for Eastern Airlines, Inc., which fact demonstrates both a strength and a weakness of the application. The president's experience as a commercial pilot would of course be valuable to an organization initiating air carrier service. However, his duties with Eastern Airlines will necessitate frequent travel and much time spent away from the operations of Air Miami. The applicant proposes to employ someone other than the president to be responsible for the day-to-day management of the company. However, despite assurances made at the hearing that "qualified" personnel are being interviewed, those qualifications are not known to this commission.

The financial statements of Air Miami reflect current assets and current liabilities in the amounts of $15,429 and $52,318, respectively. The secretary-treasurer of the applicant corporation

testified that the financial structure of the company, while adequate to support the existing charter operation, was insufficient to underwrite an air carrier operation of the type proposed. This officer sought to establish that the company has access to sufficient additional capital by producing a letter from one Mr. Belcher; by asserting that she individually could obtain a substantial line of credit; and by stating that additional investors whose identities she was not authorized to disclose had promised to provide capital in amounts which were similarly undisclosed. The letter from Mr. Belcher expressed his enthusiasm for Air Miami's proposed venture, and stated that he was "looking to extend Air Miami a line of credit of no less than $250,000." Definite terms, such as a rate of interest for credit to be extended or an amount of stock to be received for capital contributed, are not discussed. Thus, the letter serves only to identify one possible source of capital, i.e., one potential investor. It does not change the financial capabilities of the company in any definite way, and thus cannot be regarded as concrete evidence of increased financial stability. The remaining assertions of the witness were even more vague. From this testimony, we must conclude that the applicant has not sufficiently demonstrated the financial capability and resources necessary to support the undertaking which it proposes.

Air Miami proposes to initiate service with a DeHavilland Heron (18-passenger capacity) and a Cessna 402B aircraft (nine-passenger capacity), both of which have proven to be satisfactory, reliable aircraft. Four round trips per day between each city pair are proposed at rates which do not differ in any significant degree from those of the existing air carrier.

The major premise underlying Air Miami's application is that the small aircraft it proposes will garner a maximum of 20-25% of the total market, which share Air Miami contends will have no adverse impact upon Air Sunshine. In support of this contention, the applicant offered the testimony of Mr. Harold Chopp. Mr. Chopp presented a study which purported to demonstrate the impact upon the financial position of Air Sunshine of a loss of the portion of the market which Air Miami hopes to obtain. However, we believe that Mr. Chopp's analysis contains major deficiencies. Rather than using actual financial figures of Air Sunshine as a starting point, the witness attempted to "adjust" such figures so as to place Air Sunshine on a par with the operation of Naples Airlines. It is clear that Naples was selected because of its success and profitability (characteristics which render it practically unique within Florida). The witness stated that he was unable to use Air Sunshine's own figures, because if he did he could not assign to

Air Sunshine any profit. Thus, the analysis was prejudiced in the direction of the conclusion which the witness desired. In our opinion, the witness failed to demonstrate any sound basis which would justify placing the protestant into the financial "shoes" of a different corporate entity, serving a different market under different circumstances. As a result, we attach little weight to his study. The thrust of applicant's position appears to be that the presence of competition would force the existing carrier to realize economies and efficiencies, with the result that its ratio of expenses to revenues would immediately improve in the direction of that of Naples Airlines' operation. This contention overlooks two important facts. First of all, the favorable statistics enjoyed by Naples Airlines were compiled in a non-competitive situation. More importantly, the record shows that the relatively unenviable figures of Air Sunshine utilized by Mr. Chopp largely reflect a period of time during which Air Sunshine shared the market in question with a competitor, Southeast Airlines, Inc. After Southeast Airlines left the market and Air Sunshine became the sole carrier in December of 1975, its financial position began to improve significantly. The protestant presented evidence which indicates that Air Miami's proposed business would have a substantial deleterious effect upon its own operation. Bearing in mind experiences within this market and others within the state, we conclude that the protestant's is the more credible evidence on this subject.

The applicant contends that one maxim of the air carrier industry suggests that a second carrier is needed to insure quality service once the existing carrier in a given market reaches a load factor of 65% or greater. We do not regard this "rule" as a useful standard in a time of rapidly rising cost factors. Further, while the market in question fluctuates seasonally, Air Sunshine's load factor is less than 65% on an annual basis. We believe that, rather than improve service, the entry of Air Miami into the market would serve to prevent either carrier from maintaining a financially sound and viable operation capable of providing a high quality of service to the public. Such was the case during the recent period of time when the market could not support two carriers. Air Miami has not successfully demonstrated that a different result would ensue presently.

This is not to say that the commission is satisfied in every respect with the quality and quantity of service being offered by the existing carrier. Numerous dissatisfied public witnesses appeared in support of the application of Air Miami. While in some instances their complaints were refuted by the protestant, it is clear from the record that improvements in service are needed. We are con-

vinced, however, that such improvements would not be accomplished by allowing an additional carrier to enter the market at this point, even if we were to conclude that Air Miami is fully qualified in terms of business experience and financial stability. As discussed above, the record reflects that, during the time Air Sunshine was competing with Southeast Airlines, Inc., it was in a loss position financially; after it became the sole operator in the market in December of 1975, its financial position began to improve. We believe that the best way to obtain improved service to the public in this area is to provide the existing carrier with an opportunity to achieve the strong, viable financial position which is necessary before fully satisfactory service can be provided. We emphasize that, in reaching this conclusion, it is the public interest, and not the rights of the existing carrier, which is foremost in our considerations. Further, we intend to monitor closely the performance of the existing carrier, and do all we can from a regulatory standpoint to insure that every effort is made to correct any service deficiencies.

For the foregoing reasons, we conclude that Air Miami, Inc. has not demonstrated that it possesses the requisite financial stability or capability to support the proposed operation. Further, granting of the application would have a substantial adverse effect upon the existing carrier, to the detriment of the public interest.

Accordingly, it is ordered that the application of Air Miami, Inc., 1630 Micanopy Avenue, Coconut Grove, Florida, for a certificate of authority to operate as an air carrier be and the same is hereby denied.

Commissioner HAWKINS, dissenting —

I believe that the record in this case overwhelmingly demonstrates that the public is not being adequately served by the existing carrier, Air Sunshine. I believe many benefits would be derived from the addition of Air Miami to the market. For instance, the public deserves fully air conditioned service, which is proposed by the applicant. Prior to this application, the existing carrier had no air conditioning facilities at all. The threat of competition has led Air Sunshine to acquire ground air conditioning units, so that some of its passengers may at least be comfortable during the time the plane is stationary on the ground. I am convinced that competition would bring about improvements in other areas as well. Unlike the majority, I believe the load factor statistics indicate that the market can support both carriers. For these reasons, I would grant the application.